DETERMINED IN THE

# FIRST DEPARTMENT,

AT

# GENERAL TERM,

## October, 1885.

---

IN THE MATTER OF THE APPLICATION OF THE THIRTY-FOURTH STREET RAILROAD COMPANY, FOR THE APPOINTMENT OF THREE COMMISSIONERS TO DETERMINE WHETHER ITS RAILROAD OUGHT TO BE CONSTRUCTED, ETC.*

*Appointment of commissioners to determine as to the construction of street railroads — 1884, chap. 252, secs. 5, 14 — when the road cannot be constructed without the consent of existing railroads — commissioners will not be appointed when the road cannot be constructed.*

The petitioner, a corporation organized under chapter 252 of 1884 to construct and operate a street surface railroad in Thirty-fourth street, in the city of New York, having failed to obtain the consent of the owners of the property bounding thereon, applied to the General Term for an order appointing commissioners to determine whether the railroad ought to be constructed and operated. Upon the hearing it appeared from the affidavits read by objecting property owners that street surface railroads had already been built over the greater part of the route adopted by the petitioner, and that the same were then maintained and operated by the companies owning the same. It also appeared that these companies refused to consent to the construction of the petitioner's railroad.

*Held,* that the direction contained in section 5 of the said act, that upon due proof of service of notice of the application upon the property owners who have not consented, the General Term "shall appoint three disinterested persons," was not intended to be mandatory, and did not, although the refusal of such owners to consent and notice to them of the application were shown, deprive the General Term of its power to hear and consider objections raised upon the hearing, or to exercise its discretionary power as to granting or denying such application. (DAVIS, P. J., dissenting.)

---

* Decided July 17, 1885.

That section 14 of chapter 252 of 1884 was intended to and did prohibit the construction of any surface street railroad in that portion of any street in which a street surface railroad was already lawfully constructed, unless the company owning and maintaining the same consented thereto.

That the legislature had power to impose that restriction upon the right to construct surface railroads, and that the said provision was constitutional and valid. (DAVIS, P. J., discussing but not deciding this question.)

That as it appeared that the proposed railroad could not be lawfully constructed by reason of the refusal of the other railroad companies, already lawfully occupying the street with their tracks, to consent to its construction, the application for the appointment of commissioners should be denied. (DAVIS, P. J., dissenting.)

APPLICATION on behalf of the Thirty-fourth Street Railroad Company for an order appointing commissioners to determine whether the road should be constructed.

*Grosvenor P. Lowery* and *Abram Wakeman,* for the applicant.

*Horace Russell, C. A. Hand* and *Austen G. Fox,* opposed.

DANIELS, J. :

The petitioner is a railroad corporation created and organized under the authority of chapter 252 of the Laws of 1884, to construct and operate a street surface railroad in Thirty-fourth street in the city of New York. Its road is designed to be a double track surface railroad, extending over routes as they have been described in the application : " From connections with the Hudson river, at the foot of West Thirty-fourth street, through, along and upon West Thirty-fourth street and East Thirty-fourth street to connections with the ferry at the foot of East Thirty-fourth street, East river ; from connections with this company's route in West Thirty-fourth street, at Tenth avenue, through along and upon Tenth avenue to West Forty-second street ; thence through, along and upon West Forty-second street to connections with the ferries at the foot of that street, at the Hudson or North river, together with all switches, sidings, turn-outs and turn-tables and suitable stands as may be necessary for the convenient working of such road."

Notice of the application has been given, as it was provided it should be by section 5 of this act. This notice has been required to be given to each abutting property owner who may be found not having given his consent to the construction and operation of the rail-

road, and the object to be promoted by giving such notice was to secure to these owners an opportunity to appear and oppose the application made for the appointment and selection of commissioners. The act has not in terms declared that object, but it results from the fact that notice of the application has been directed to be given to the persons withholding their consent, and that could have been designed for no other purpose than to permit them to contest the application for the appointment and selection of commissioners. On behalf of the owners of abutting property on that part of Thirty-fourth street extending from Sixth, easterly to Lexington avenue, the right of the company to the appointment of commissioners has been contested and denied. This portion of Thirty-fourth street, with the exception of church edifices fronting upon parts of it, has been devoted to the erection and maintenance of private residences, many of them of a very costly character. And their owners to a great extent very decidedly object to the construction and operation of the railroad over this portion of the street. In support of their opposition various facts have been relied upon to render it effectual, which may be more appropriately considered hereafter.

The extreme length of the petitioner's proposed railroad is 12,357 feet, over much the greater part of which other surface railroads have already been built and are now maintained and operated. One of these railroads is that of the Forty-second Street, Manhattanville and St. Nicholas Avenue Railway Company. That includes the space between the Hudson river and Tenth avenue, for a distance of 1,800 feet. The Forty-second Street and Grand Street Ferry Railroad Company also has its two tracks upon this portion of Forty-second street, and then proceeds by the way of Tenth avenue to Thirty-fourth street, a distance of 2,100 feet, and thence upon Thirty-fourth street to Sixth avenue for a further distance of 3,600 feet. And the New York and Harlem Railroad Company owns, maintains and operates a double track surface railroad in Thirty-fourth street, extending easterly from Lexington avenue to the East river, a distance of 2,304½ feet. These several railroad companies have refused their consent to the construction of the petitioner's railroad, and upon that fact the resistance has been mainly placed to the success of the petitioner's application. By

section 14 of chapter 252 of the Laws of 1884, under which the petitioner has been incorporated, it has been provided and declared that : " Except for necessary crossings, no street surface railroad company shall construct, extend or operate its road or tracks in that portion of any street, avenue, road or highway in which a street surface railroad is or shall be lawfully constructed, except with the consent of the company owning and maintaining the same, provided, however, that any two or more railroad companies now existing or hereafter formed under the provisions of this act, may join and unite and use each other's tracks for a distance not exceeding one thousand feet, whenever the court, upon an application for the appointment of commissioners next hereinafter provided, shall be satisfied that such use is actually necessary to connect main portions of a line to be constructed as an independent railroad, and that the public convenience requires the same, in which event the right of such use· shall be given only for a compensation, to an extent and in a manner to be ascertained and determined by commissioners to be appointed by the courts, as provided in respect to acquiring title to real estate under chapter one hundred and forty of the Laws of eighteen hundred and fifty, entitled ' An Act to authorize the formation of railroad corporations and to regulate the same,' and the several acts amendatory thereof ; or by the board of railroad commissioners in cases where the companies interested shall unite in a request for such board to act.   Such commissioners, in determining the compensation to be paid for the use by one company of the tracks of another, shall consider and allow for the use of tracks and for all injury and damage to the company whose tracks may be so used."

And by its very plain language it has been made impracticable as the facts have been made to appear, for the petitioner to construct or maintain a surface railroad over so much of these streets as have already been devoted to the construction and operation of the other street surface railroads.   To that extent the act is very plain, and was designed to prevent the construction and operation of competing surface railroad lines, against the dissent of the companies whose railroads have been previously constructed and are still in operation. The intention and object of the section throughout have not been declared in such language as to be entirely free from ambiguity, but upon this particular subject no ground has been left for misap-

prehending the intention of the legislature. It has, however, been suggested that the legislature did not possess the authority under the Constitution to provide or impose this restriction or disability, but the Constitution has nowhere, either in express words or by reasonable implication, deprived the legislature of this power. It has, on the contrary, by section 18 of article 3, invested the legislature with plenary authority to pass general laws providing for all the cases enumerated in this section, and one of those cases which cannot be provided for by a special law, is that of granting to any corporation, association or individual, the right to lay down railroad tracks. And it was made the imperative duty of the legislature to pass general laws providing for that object, and chapter 252 of the Laws of 1884 is one of the acts which has been passed by the legislature to provide for the construction and operation of street railroads. Neither this portion of the Constitution, nor any other, has further abridged the power of the legislature than to declare that, " no law shall authorize the construction or operation of a street railroad except upon the condition that the consent of the owners of one-half in value (of) the property bounded on and the consent also of the local authorities, having the control of that portion of a street or highway upon which it is proposed to construct or operate such railroad, be first obtained, or in case the consent of such property owners cannot be obtained, the General Term of the Supreme Court in the district in which it is proposed to be constructed, may, upon application, appoint three commissioners who shall determine, after a hearing of all parties interested, whether such railroad ought to be constructed or operated, and their determination confirmed by the court, may be taken in lieu of the consent of the property owners." Beyond these specified restrictions as to the laws which should be passed, the Constitution has not undertaken to declare, or define, what the act may contain or what may be included in it. It cannot permit a street railroad to be constructed or operated except upon a compliance with these requirements. So far a disability has been imposed upon the legislature, and its legislative authority has been limited, but beyond that no restriction over this subject has been placed upon its legislative power. How the end intended to be accomplished should be secured, after the observance of these restraints, was necessarily left to the judgment and discretion of

the legislature; for so far as the act might be made to include sub-
jects not within these specified restraints it would clearly be within
the broad grant of legislative authority made by the Constitution
to the legislature, and that includes all legislative authority of every
description not restricted or abridged by some express or implied
prohibition of the Constitution.   This subject was considered in *Peo-
ple ex rel. McLean* v. *Flagg* (46 N. Y., 401), where it was said, in the
opinion of the chief judge, with the concurrence of all his associates,
that "all legislative power is conferred upon the senate and assembly;
and if an act is within the legitimate exercise of that power, it
is valid, unless some restriction or limitation can be found in
the Constitution itself.   The distinction between the United States
Constitution and our State Constitution is, that the former confers
upon congress certain specified powers only, while the latter con-
fers upon the legislature all legislative power.   In the one case the
power specifically granted can only be exercised; in the other, all
legislative powers not prohibited may be exercised."   (Id., 404.)
And *Bank of Chenango* v. *Brown* (26 N. Y., 467) is to the same
effect.   So much of the enactment as is contained in section 14 of
chapter 252 of the Laws of 1884 is clearly an appropriate exercise
of legislative power.   It was entirely judicious for the legislature
to prohibit the construction of another railroad in the public streets
of a city so far as they might previously have been occupied for
that object by other companies acting under the sanction and
authority of the law.   And no refined or purely artificial distinc-
tions can be permitted to stand in the way of the exercise of this
legislative authority.   This subject was also considered by the same
chief judge in *People ex rel. Hatfield* v. *Comstock* (78 N. Y., 356),
where it was held that " it must be borne in mind that the senate and
assembly possess all legislative power, except when forbidden or
restricted by other provisions of the same instrument, and hence it is
necessary, in order to successfully challenge the constitutionality of an
act of the Legislature, within the purview of legislative power, to find
some provision which either restricts or prohibits the power which
it has exercised.   Every presumption is in favor of its validity."
(Id., 361.)   Bet ween this section of the act of 1884 and the Constitu-
tion there is neither a direct nor manifest conflict, for it in no manner
restricts, limits or enlarges what the Constitution in any form has

declared shall or shall not be done. There is no provision either in this or any other part of the Constitution which has declared expressly, or by implication, that a railroad company shall be entitled to construct and operate its railroad over that portion of a public street in a city which has already been devoted to or appropriated by another railroad. These provisions of the Constitution have wholly been directed to other subjects. Their object has been to prevent the construction of railroad tracks under the authority of a special law, and to require it to be done through the instrumentality of a general law. And even when a general law may be enacted, before a railroad can be constructed under its authority, it has been made requisite that the consent of the owners of one-half in value of the property bounded on that portion of the street or highway, upon which it is proposed to construct or operate the railroad, as well as the consent of the local authorities having control of that portion of the street, shall be first obtained. And if the consent of such owners cannot be obtained, then the General Term of the Supreme Court may appoint three commissioners, whose determination, confirmed by the court, shall stand in the place of the consent of the property owners. So much has been required for the observance of these provisions of the Constitution, but no more than that has in any form been declared. And, consequently, the entire range of legislation beyond that was within the authority, judgment and discretion of the legislature itself. And the prohibition which is now under consideration was plainly within that extent of legislative power, for it has not been declared that the legislature could make no further requirements than those declared by these provisions of the Constitution. All that has been declared is that these restraints shall be observed, and beyond them what further may be required for the protection of either public or private interests, has necessarily been confided to the good sense of the legislature. Over these streets it has control, and could determine and declare, as it has by this enactment, what further restraints should be imposed upon a street railroad company, before it should have the right or privilege of using the streets for the construction and operation of its railroad tracks. This part of the act, therefore, cannot be disregarded as a violation of any of the provisions or restraints of the Constitution, but it should be considered a proper and judicious

exercise of legislative power, and as such required to be observed by the court in the disposition of this application. And as it has been made entirely evident, from the fact that the consent of these other railroad companies has been withheld from the construction of the applicant's proposed road, that the appointment of the commissioners to hear and determine the parties interested and report whether the railroad ought to be constructed, would be entirely futile, the application should not be allowed to prove successful.

It has been suggested that the court has no discretion which it is at liberty to exercise upon this subject    For by section 5 of chapter 252 of the Laws of 1884, it has been provided that upon due proof of the service of the notice required to be given, the General Term "shall appoint three disinterested persons who shall act as commissioners." But that this was not intended to be mandatory is quite clear from the preceding portions of the act. For if upon mere proof of service of the notice it should become the unqualified duty of the court to appoint the commissioners, there could be no useful object whatever in requiring it to be served. It would be no less than absurd to require a notice to be given to the parties opposed to the construction and operation of the railroad, and upon their appearance before the court to deny them the right to object, as that would be denied if the commissioners must be appointed upon mere proof of service of the notice. That could not have been the design of the legislature. But what was intended, as has already been observed, was, that the property owners opposing the construction of the railroad should be afforded an opportunity of resisting the application for the appointment of the commissioners, and to secure this opportunity to them this notice was required to be served.

The act, therefore, although in form mandatory, is required to be constructed as merely authorizing the court to appoint the commissioners if the exercise of that authority shall appear to be discreet and just, after hearing the parties opposed to the construction of the railroad. And that this was the design of this portion of the law is made further evident from the provisions contained in the Constitution itself, for by those provisions it has been declared that the General Term "may" upon application appoint the three commissioners. And it is not to be supposed, as long as a different construction is well warranted by this portion of the act, that the

legislature designed to render the duty of the court any more imperative than that had been prescribed by the Constitution itself. The rule of construction, on the contrary, would require the act, as that may be done in view of its other provisions, to be harmonized with the Constitution, and to leave the power to be exercised by the General Term discretionary in its nature.

Instances do undoubtedly arise where the word "may," which has been employed as descriptive of the powers of the General Term over this subject, has been construed to be mandatory and of the same effect as the word "shall." But that construction has not been given to the word "may" when it has been employed as it is in this part of the Constitution of the State. For by no part of that which precedes or follows this delegation of authority has the Constitution employed language indicating it to be the duty of the court to appoint the commissioners, as a matter of course, where the consent of a majority of the property owners cannot be obtained. And it is a remarkable fact that under the Constitution, with very slight exceptions, this word "may" has only been employed when it was intended that the power to which it referred should be of a discretionary character. Section 8 of article 1 and 7 of article 5, seem to be exceptions to this rule, but in other cases where the intention has been manifested that the directions of the Constitution shall be imperatively carried into effect the word "shall" has with great uniformity been employed. More care in this respect has been observed than is usually applied to the enactment of statutes. And as the word "may" has been so understandingly employed in the Constitution, it must be allowed to have its ordinary force and effect in its provisions where, from the subject-matter to which it relates, or from the context, no different intention has been manifested. In this part of the Constitution the word seems to have been used in the ordinary understanding of its signification, and it stands immediately in contrast with the declared duty of the commissioners after they shall have been appointed, concerning whom it has been said that they "shall determine," after a hearing, etc., whether the railroad ought to be constructed. Even if this language had been included in the enactment of a statute, it would require the same construction to be given to it. For it is a rule of construction which has been applied

to this particular word, that " the ordinary meaning of the language must be presumed to be intended unless it would manifestly defeat the object of the provisions." (*Minor* v. *Mechanics' Bank, etc.*, 1 Peters, 46, 64.) No antecedent duty has been required to be carried into effect by this provision of the Constitution, and no existing public or private interest has been designed to be specially protected by it. And for that reason also this construction of the word "may" is clearly warranted. In the cases where it has been differently construed that construction has been given to it to carry into effect what, under the circumstances, was justly considered to have been the intention of the legislature. Where the power conferred has been provided for rendering a duty effectual, or for promoting the ends of justice, or securing public or individual interests, there the term has been construed to be mandatory. But "where it is merely indifferent whether a thing shall be done or not, then the word may, in an act, is usually construed to confer a permissive authority. But where the public interest or private right requires that the thing should be done, then the word may is generally construed to mean the same as shall." (*People ex rel. Conway* v. *Supervisors*, 68 N. Y., 119, 155 ; *Hagadorn* v. *Raux*, 72 id., 583, 586 ; *People ex rel. Otsego Co. Bank* v. *Supervisors*, 51 id., 401.)

From the manner in which this word " may" has been used in this part of the Constitution and its relation to the subject provided for, it can, therefore, only be construed as designed to have been permissive, and to empower the court, upon the application for the appointment of commissioners, to determine, under all the circumstances, whether the appointment should be made or not. And where, as in the present case, it has been made entirely evident that the proposed railroad cannot be lawfully constructed by reason of the refusal of other railroad companies already lawfully occupying the streets with their tracks to consent to its construction, the appointment of commissioners should not be made. For the hearing and report, if it should be favorable to the applicant, would, under this prohibition of the statute, be entirely without effect. And it could not have been intended by the Constitution that an appointment necessarily resulting in that manner should be made at all.

It has also been shown by the affidavits produced on the part of the contestants that the amount of travel upon the portion of Thirty-fourth street bounded on the east by Lexington avenue and on the west by Sixth avenue is so slight as not to require, for the convenience of the public, the construction of this railroad. It has been further shown that the street is not at this time adapted to any prospective purposes of business, but within these bounds must continue to be used for private residences; that the value of the private property within these boundaries is the sum of about ten millions of dollars, which, in the judgment of persons familiar with it, would be depreciated to the extent of three millions, by the construction and operation of a railroad between these points. These facts have not been denied, and must for that reason be regarded as having been established by the affidavits. And they supply a further, as well as a very cogent reason, for rejecting the application now made to the court.

Under all the facts as they have been presented, that seems to be the plain course of duty. And as this court is required to exercise its judgment upon the propriety of the application, and the commissioners cannot as the law has been enacted be appointed with benefit to the applicant or advantage to the public, and the property of the abutting owners on this portion of the street would be seriously depreciated by its success, the application which has been made should be denied.

BRADY, J.:

The question discussed by Justice DANIELS did not arise on the application of the petitioners in the Broadway surface railroad proceeding.

The petitioners herein seek to occupy roads already built when a consent cannot be obtained for that purpose, and it is patent now that such is the fact. It cannot be gainsaid. The contestants should not be required to appear before the commissioners who might be appointed and there present their objections, when it now appears that a fatal infirmity exists. The consents contemplated in such a matter as this are not only those of the owners and the city, but of the companies having rails already in use. This court has no power over these companies or their rights under the act. If the last prerequisite may create objectionable monopolies, it is for

the law-makers to change the statute on the subject.  We have not the right to do it.  The legislature may well have thus provided in order to protect franchises perfected and in use when the act of 1884 was passed, and which might be seriously invaded if other companies could use its tracks *nolens volens..*

This court should not, in this or any other proceeding, permit as a means to an end, the employment of any process when it is apparent that a special lawful impediment exists, and the result in view cannot therefore be attained.  The opponents having general reasons for contention should not be subjected to the expense and trouble of a contest under such circumstances.  If the commissioners should report in favor of the projected road, the petitioners could not succeed unless the consent suggested was obtained, and this result is a complete answer to the propriety of appointing the commissioners now.

I agree therefore with Justice Daniels, that we have presented to us at the threshold of this matter an objection which calls upon us to deny the application for the appointment of commissioners.

Davis, P. J. (dissenting) :

It is due to the elaborate and able opinion of my brother Daniels that I should state the reasons that prevent my concurrence in his views and conclusions.  This I shall do briefly and so far as practicable without elaboration.  I agree that the statute is to be so construed as to harmonize with the provision of the Constitution, and that the use of the words " *shall* appoint," as they appear in the statute, does not present a case of excess of authority by the legislature, because the Constitution uses the words " *may* appoint." On the contrary, it is the duty of the courts to regard these several phrases as expressing the same idea, to wit, the duty of the General Term of the Supreme Court to carry out the plan of the provision of the Constitution whenever an appropriate case for its execution is presented to the court.  Neither phrase was used for the purpose of conferring on the court any power beyond that essential to set in motion the machinery contemplated and authorized by the Constitution.  The provision of the Constitution was intended to interdict absolutely all special laws for the creation of such railroad corporations as are within its description, and within the mischiefs

aimed to be prevented; and at the same time to provide by general laws for an effective mode of securing the construction of railroads by corporations created thereunder, whenever the public exigencies or necessities demand. For the construction of street railroads two things are made primarily essential: First. The consent of the public authorities having jurisdiction of the streets to be occupied. Second. The consent of the owners of the real property abutting on the several streets to be affected. But as it was manifest that it might occur that the abutting owners might refuse assent, owing to real or supposed local injuries, in cases in which the greater public interest would require the construction of the road notwithstanding such refusal, the Constitution provided for such cases by creating a special forum, in which the question whether the railroad ought to be built notwithstanding the refusal, could be fully and fairly tried; and in which forum such owners and all parties interested in the general question should be entitled to be heard in and by all the familiar modes of trials of questions of fact before such a body, and whose report and determination, if favorable to the construction, when confirmed by the General Term should stand in place of the consent of such owners. Power was therefore conferred by the Constitution upon the General Term of the Supreme Court, in a case where the consent of a majority of the owners along a street in the line of the proposed railroad could not be obtained, upon proper presentation of that fact, to appoint three suitable commissioners to hear, try and determine the question whether the road ought to be constructed, notwithstanding the inability to procure such consent. The scheme is a very simple one. It confers upon the court, a naked power of appointment of commissioners for a clearly specified purpose. It gives no power to the court to hear, try or determine, in the first instance, the question that is to be sent to the commissioners. That power is given to the commissioners alone; and it is only when their report, with the evidence laid before them, and the reasons assigned by them for their conclusion are brought before the court for confirmation that the plan of the Constitution permits the court to exercise jurisdiction or discretion over the question submitted to the commissioners, whether the road ought to be constructed notwithstanding the antagonism of abutting owners.

It is thought and argued that because notice is required to be given to the non-consenting owners of the application for commissioners, therefore such owners may be heard by the General Term, not only on the question whether a case is shown by the petitioners in which the Constitution authorizes and directs the appointment of commissioners, and upon the question who are suitable persons to be appointed, but also on the very question which the Constitution directs to be submitted to the commissioners. In other words, it is claimed that the Constitution is to be read as though it provided that the question whether the road ought to be constructed without the consent of the abutting owners shall be sent to commissioners if the court shall first decide on a hearing of the parties interested that it ought to be so constructed. That this is not the meaning of the Constitution is manifest to my mind, because no adequate means are provided for such a hearing by the General Term in the first instance. Nothing is provided for but the presentation by proper proofs of the fact that a majority of abutting owners have refused to consent, or rather .that their consent cannot be obtained, and that they have been duly notified of the application for the appointment of commissioners. These two facts being satisfactorily established clothe the General Term with jurisdiction to do only what the Constitution enjoins, to wit, to appoint commissioners. The owners and other parties notified, or being in interest, may come in and be heard on the questions thus presented. They may show that consents have been given and, therefore, no commissioners are necessary, or that consents have not been properly applied for, or have not been refused, or any material facts bearing upon those questions; or any fact touching the suitability of persons named or to be named as commissioners. In other words, they may contest the questions presented by the application, and material to the right claimed by the petitioners, to have commissioners appointed on the ground of inability to get consent of a majority of owners along the street, but they are not at liberty to try before the court on their *ex parte* affidavits or otherwise the question to be tried under the Constitution by the commissioners alone. The court are not commissioners, and are not recognized as such by the Constitution or the law. They are at this stage of the proceeding a mere part of the scheme of the Constitution through which commissioners

are to be called into existence and set in motion to hear and determine the grave question which the constitution commits primarily to them alone. The General Term in doing this, act ministerially rather than judicially. For the court to undertake to try and decide the question whether or not the railroad ought to be constructed notwithstanding the refusal of owners as one that shall control the appointment of commissioners, as it may hold upon it favorably or adversely to the construction of the road, is in my opinion mere usurpation. I am not considering whether or not my brother DANIELS has reached a correct conclusion upon the *ex parte* affidavits before us, that the railroad of petitioners ought not to be constructed, because, firstly, I think the court has no power at this stage of the proceedings to pass upon that question; secondly, if it had power it ought not to be exercised upon *ex parte* affidavits and without the trial contemplated by the Constitution at which witnesses can be orally heard and examined and the opportunity given to both or all sides to present proofs, reasons and arguments, as they shall be advised. The trial by the General Term on the papers now before it resulting in a refusal to appoint commissioners, seems to me a mere travesty of the scheme of the Constitution which we are bound to respect and protect. The reasons urged for our denial of the appointment by my learned brother, may with great propriety be urged before the commissioners and be held, if they think them well founded, sufficient to warrant an adverse report, but we have nothing to do with them in the form of *triers* till they come before us in the report of the commissioners with the proofs duly taken and first passed upon by them. This was the course taken by the General Term in the Broadway railroad case; and after the commissioners had made their report the General Term proceeded to consider its propriety upon the evidence and facts reported, and to affirm the same, against my dissent. The same course as to the form of procedure should be taken here, for this court will ultimately on the coming in of the report, etc., have jurisdiction to confirm or reject the conclusions of the commissioners as shall seem equitable and just to its constitutional discretion. But it is urged and elaborately argued, that the General Term should deny the appointment of commissioners, because it appears that other street railroads are constructed and in operation upon some portions of the projected

route of the petitioners, and it is not shown that they have consented to the construction of the petitioners' road along the portions of the route so occupied by such other street railroad. It is first to be observed that the existence of such roads is in itself no objection to the construction of other roads. The sting of death is supposed to be in the want of the consent to construct another road in the same street. Affidavits are produced to show that such consent has not been obtained and as the affiants believe will never be given. There is nothing in the law to make it essential to obtain such consent before it shall be tried and determined by commissioners whether the railroad ought to be constructed notwithstanding the refusal of consent by abutting owners of some street or streets on its route; nor is that fact any valid reason for refusing to appoint commissioners, because *non constat* that after it is found (if it shall be) that the road ought to be built, the other railroad will persist in refusing consent. The presumption ought to be that when it is shown that the public interest requires that another railroad should be constructed to accommodate another route, the mere fact that in doing so it must pass along some portion of a street already occupied by an existing railroad will not be seized upon by the latter to defeat a public demand. But the argument stands upon the popular faith that a corporation of this character is a concentration of human selfishness freed by law from all moral responsibilities, and therefore the present occupying railroads will withhold consent forever. This assumption is easily overthrown when the fact is recalled to mind that no such corporation was ever known to stand out long *against its own interests;* and whenever it is made to appear that it is for the interests of the occupying railroads to consent those companies will speedily show that " one refusal's no rebuff."

It is the right, therefore, of the petitioners, if they can do so, to put themselves in the position to apply for the consent of the other railroads in an effectual way, and test the question whether it can be rightfully refused or cannot be obtained by suitable *arguments* or arrangements. To treat the assertion, made on *ex parte* affidavits, that such consent cannot be obtained, as conclusive of all right of a newly projected railroad to construct a public improvement, is in my judgment against public policy and imminently injurious to all

improvements.   It is to establish by a judicial act a most danger-
ous and fatal monopoly, which may be wise in this case, but in
some cases would result in vesting an inefficient and contemptible
railroad, which has lawful possession of a few rods of some street
through which a most important public improvement must pass,
with power to defeat and forever prevent its construction ; and also
from even trying the question whether or not it ought to be constructed
in the mode provided by the Constitution.   The petty horse rail-
roads of this city ought to have no such absolutely controlling
power.   Their modes of locomotion are destined ere long to give
way to more rapid, cleanly and healthy kinds of travel, to the relief
both of man and beast on the cars, and to the great advantage of
the traffic and commerce of the city and the well-being of its citi-
zens.   I am not content to hold that a constitutional proceeding by
a newly projected railroad corporation to try a question affecting
one street however important it may be can be defeated altogether
by the present refusal of a railroad now in possession of a portion
of some street on its general route.   The rule sought to be applied
to this case will necessarily have that effect in all cases, and it ought
not, therefore, to be applied.   For nothing is more injurious to
public interests than to clothe our present street railroads with an
absolute veto of all the probable or possible advances of science
and invention in the modes of using the public streets.

I do not doubt that this objection with all others suggested may be
presented to the commissioners who will have full opportunity to
examine and ascertain all the force and effect that should be allowed to
it ; and that it may, if the facts of the case seem suitable, be deemed
by them a sufficient reason for an adverse report (in which case this
court can review their conclusion), but it ought not to be established
as a fatal bar to a motion for an opportunity to be heard before
a commission on that and the other questions involved in the
application.

If we hold, in accordance with the views expressed and urged by
my brother DANIELS, it will be of no consequence that every person
owning lands abutting the street or part of a street occupied by the
non-consenting railroad, has consented and is anxious to have the
projected road constructed, or that the street is so wide that both
can be amply accommodated without injury to either; or that the

new road will accommodate vast numbers of people, while the old one is a mere nuisance to the general public, for the decision will clothe it under the law with a monopoly gross and odious — a chartered counterpart of the fabled " dog in the manger."

I do not now discuss what I consider to be a very grave question whether the legislature has power under the constitutional provision to turn over to any existing corporation the absolute and final right to say whether or not a like corporation may be created and exist for the public benefit.   What is done by the act under consideration, is to empower one corporation organized for a public use and authorized to occupy a public street in the exercise of its functions to declare that under no circumstances of public necessity, though all the public authorities having jurisdiction of the street consent, and all the people interested in the subject-matter agree to its benefit and necessity, shall any other railroad occupy any portion of the same street.   It is true the legislature is omnipotent in legislation where not expressly or by necessary inference restrained by the Constitution.   But legislating by its own act is one thing, and making over its power of legislation to another body or corporation is another and different thing.   And especially is this so where the power conferred upon a corporation is to declare and make itself an absolute monoply to take and hold against all comers the right to use a public street when the interest of the public require its use to be extended to another similar corporation.   The legislature may undoubtedly enact by law, that but one railroad shall exist in any one street; but it may well be doubted if it can enact that an existing corporation shall have the power of absolute control of that same question The point would be sharply presented if in enacting the general railroad law, the legislature had enacted that no railroad parallel to that of the Hudson River and New York Central Railroad Company should ever be constructed from New York to Buffalo, without the consent of that corporation.   Such an abdication of legislative functions would be handing over to a railroad corporation a most important legislative power, which the Constitution requires to be exercised by the legislature only, and would in spirit be hostile to that provision of the Constitution which forbids railroads to be constructed by special law but allows their construction under a general law, and prescribes the mode of

obtaining consent of owners and the process to be substituted for such consent for determining whether they ought to be built. To subordinate the constitutional provision for meeting the demands of public interest and necessities, by the construction of street or other railroads, to the will of existing corporations, with which they may come into competition, is a mockery of its plain intention; for under the general laws authorized by the Constitution, the question must always be, what do the public interests require, and not what will some existing corporate monopoly consent to.

The Constitution intended to open such questions by general laws to all the people, not to shut them up forever for the benefit of existing corporations; and legislation to accomplish the latter defeats the intent and object of the Constitution. I am not able therefore, to concur with my brethren. On the contrary, I think the only subject for the General Term to pass upon now, is whether the petitioner has shown that a majority of owners along that part of the route under consideration have refused to consent to the construction of the petitioners' railroad.

The commissioners must, in the first instance, take care of all the other questions, subject, of course, to the power of the General Term, which is most ample, to review their report whenever it comes in as shall then appear to be just and equitable. It is, I think, well settled law that where a duty to appoint commissioners to hear and determine a specified question is conferred by statute upon a court or any other body, upon the presentation of certain facts, the duty is so far administrative in its nature that the obligation becomes imperative, even though the language used by the statute might under other circumstances be regarded as conferring a mere discretion. (*People ex rel. Conway* v. *Supervisors*, 68 N. Y., 115; *Hagadorn* v. *Raux*, 72 id., 583; *People ex rel. Otsego Co. Bank* v. *Supervisors*, 51 id., 401.)

Such action does not in any sense permit the appointing body (where authority to review the action of the commissioners is conferred) to pass upon any question whatever, beyond that of the sufficiency of the proofs showing that the fact exists which authorizes the court or body to appoint commissioners. I think the affidavits presented in this case do show that the consent of a majority of the

property owners of that part of the route of the petitioners' proposed road affected by this proceeding cannot be obtained, and the petitioners are entitled to have commissioners appointed. For these reasons I dissent from the denial of the motion.

Motion denied.